*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0385p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PAUL BROWN, WILLIAM FANALY, CHARLES
THOMAS, GARY RIGGS, ROBERT ORLIKOWSKI, and
SCOTT WAY,

        *Plaintiffs-Appellants,*

       *v.*

CASSENS TRANSPORT CO., CRAWFORD & COMPANY,
and DR. SAUL MARGULES,

        *Defendants-Appellees.*

No. 05-2089

On Remand from the United States Supreme Court
No. 04-72316—Paul D. Borman, District Judge.

Argued: July 27, 2006

Decided and Filed: October 23, 2008

Before: MOORE and GIBBONS, Circuit Judges; ACKERMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Marshall D. Lasser, LAW OFFICE OF MARSHALL LASSER, Southfield, Michigan, for Appellants. Janet E. Lanyon, DEAN & FULKERSON, Troy, Michigan, Joan N. Pierson, THE WILLIAMS FIRM, Grand Blanc, Michigan, for Appellees. **ON BRIEF:** Marshall D. Lasser, LAW OFFICE OF MARSHALL LASSER, Southfield, Michigan, for Appellants. Janet E. Lanyon, DEAN & FULKERSON, Troy, Michigan, Timothy R. Winship, THE WILLIAMS FIRM, Grand Blanc, Michigan, for Appellees.

_____

## OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. This case involves the dismissal of the claims of Plaintiffs-Appellants Paul Brown, William Fanaly, Charles Thomas, Gary Riggs, Robert Orlikowski, and Scott Way (collectively referred to as "plaintiffs") against Defendants-Appellees

_____

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

Cassens Transport Company ("Cassens"), Crawford & Company ("Crawford"), and Dr. Saul Margules (collectively referred to as "defendants") under Federal Rule of Civil Procedure 12(b)(6). The plaintiffs alleged that the defendants employed mail and wire fraud in a scheme to deny them worker's compensation benefits under the Michigan Worker's Disability Compensation Act ("WDCA"), MICH. COMP. LAWS § 418.301, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(1)(B), 1962(c), 1964(c), and that the defendants' conduct constituted intentional infliction of emotional distress ("IIED") under Michigan law. The plaintiffs appealed the district court's dismissal of their RICO claims based on the reverse preemption of the RICO claims under the McCarran-Ferguson Act, 15 U.S.C. § 1012, and for failure to plead certain claims with particularity, for failure to allege a pattern of racketeering activity, and for failure to plead reliance on the defendants' fraud. A divided panel of this court affirmed the district court's dismissal of plaintiffs' RICO claims because plaintiffs had failed to plead detrimental reliance on alleged misrepresentations of defendants. The Supreme Court vacated our judgment and remanded for further consideration in light of *Bridge v. Phoenix Bond & Indemnity Co.*, — U.S. —, 128 S. Ct. 2131 (2008), which held unanimously that a civil-RICO plaintiff does not need to show that it detrimentally relied on the defendant's alleged misrepresentations.

On remand, we **REVERSE** the district court's dismissal of plaintiffs' RICO claims because the WDCA does not preempt their RICO claims and because plaintiffs have sufficiently pleaded a pattern of racketeering activity given that reliance is not an element of a civil RICO fraud claim. We **REMAND** to the district court for further proceedings consistent with this opinion. The plaintiffs also appeal the district court's dismissal of their IIED claims for failure to plead outrageous conduct. We **AFFIRM** the dismissal of the IIED claims because the alleged conduct of these defendants could not be deemed outrageous under Michigan law.

## I. BACKGROUND

Plaintiffs are current or former employees of Cassens who have submitted worker's compensation claims to Cassens based on workplace injuries they have each sustained. On June 22, 2004, plaintiffs filed a complaint raising RICO and IIED claims against the defendants. Plaintiffs alleged that Cassens, which was self-insured for purposes of paying benefits under the WDCA, contracted with Crawford to serve as a claims adjuster for the worker's compensation claims of Cassens's employees. They further pleaded that Cassens, Crawford, and Margules, as well as other "cut-off" doctors, engaged in a pattern of racketeering activity that denied the plaintiffs' worker's compensation claims. Specifically, the plaintiffs alleged that Cassens and Crawford deliberately selected and paid unqualified doctors, including Margules, to give fraudulent medical opinions that would support the denial of worker's compensation benefits, and that defendants ignored other medical evidence in denying them benefits. The plaintiffs claimed that the defendants made fraudulent communications amongst themselves and to the plaintiffs by mail and wire in violation of 18 U.S.C. §§ 1341, 1343, which serve as the predicate acts for their RICO claims.

The district court granted the defendants' motion to dismiss pursuant to Rule 12(b)(6) on July 15, 2005. *Brown v. Cassens Transp. Co.*, 409 F. Supp. 2d 793 (E.D. Mich. 2005). The plaintiffs filed this timely appeal.[1] A majority of this panel affirmed the dismissal on the ground that plaintiffs failed to plead that they relied on misrepresentations by defendants. *Brown v. Cassens Transp. Co.*, 492 F.3d 640, 643, 646 (6th Cir. 2007). The U.S. Supreme Court granted plaintiffs' petition for a writ of certiorari, vacated our judgment, and remanded the case to us for reconsideration in light of *Bridge*. *Brown v. Cassens Transp. Co.*, — U.S. —, 128 S. Ct. 2936 (2008).

---

[1]The plaintiffs filed a motion for leave to file an amended complaint, but they did not appeal the district court's denial of this motion in their Notice of Appeal. Therefore, that decision is not before us. FED. R. APP. P. 3(a)(1).

## II. STANDARD OF REVIEW

We review de novo a district court's determination dismissing a suit for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). *Hill v. Blue Cross & Blue Shield*, 409 F.3d 710, 716 (6th Cir. 2005). The plaintiffs' factual allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiffs. *Id.* We will not affirm the district court's dismissal of a complaint on Rule 12(b)(6) grounds "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Id.* (alteration in original) (internal quotation marks omitted).

## III. DISMISSAL OF THE CLAIMS OF THOMAS AND RIGGS FOR FAILURE TO STATE A PATTERN

### A. General Contours of the RICO Pattern Element and the District Court's Approach

RICO makes it a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO defines "racketeering activity" to include "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 [18 U.S.C. § 1341] (relating to mail fraud), section 1343 [18 U.S.C. § 1343] (relating to wire fraud)." *Id.* § 1961(1)(B). Plaintiffs claim that defendants engaged in the racketeering activities of mail and wire fraud.[2]

RICO states that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). On this basis, the district court assumed that alleging two acts of racketeering activity was sufficient to state a pattern, and dismissed the claims of Riggs and Thomas because they sufficiently pleaded only one act each of racketeering activity. The plaintiffs appeal this conclusion, claiming that the district court was instead required "to look at the pattern of defendants' alleged scheme against the group" rather than "the number of predicate acts allegedly committed against each victim." Appellants Br. at 25-26.

### B. The District Court Erred by Focusing on the Number of Predicate Acts Alleged by Each Plaintiff

RICO's provision authorizing civil suits, 18 U.S.C. § 1964(c), sheds light on the issue of predicate acts. Section 1964(c) states that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]" may bring a RICO suit. RICO specifies only that the defendant must have engaged in a "pattern of racketeering activity" to violate 18 U.S.C. § 1962. As long as the defendant engaged in a pattern of racketeering activity, and the plaintiff was injured by this pattern of activity, this suffices to state a claim under 18 U.S.C. § 1964(c); nowhere does the statute require that the injury to each plaintiff must have independently consisted of a pattern of activity by the defendant. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 250 (1989) (looking only to the activities of defendants and not the number of predicate acts against each plaintiff in assessing whether a pattern of racketeering was sufficiently pleaded); *Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir. 1992) ("We do not hold that a civil RICO plaintiff must necessarily be directly harmed by all

---

[2]Plaintiffs also pleaded that defendants engaged in witness tampering in violation of 18 U.S.C. § 1512, which also constitutes a predicate act of racketeering under RICO, *see* 18 U.S.C. § 1961(1)(B). The district court dismissed the witness-tampering claims, and plaintiffs do not press these claims on appeal.

the alleged predicate acts, because harm from one enumerated violation may, in certain situations, be sufficiently connected."). Therefore, the district court erred in assessing the pattern requirement by counting the number of predicate acts alleged by each plaintiff. Rather, the district court should have considered whether the plaintiffs sufficiently pleaded that the defendants were engaged in a "pattern of racketeering activity," and, if so, whether they also sufficiently pleaded that each plaintiff was injured by this pattern of activity.

Although the defendants do not appear to take issue with the district court's holding that two predicate acts constitute a "pattern of racketeering activity," and thus that a pattern was specifically pleaded by Brown, Fanaly, Way, and Orlikowski,[3] *see* Appellees Br. at 16 (requesting that the district court's decision on whether a pattern was established be upheld), we must consider whether the defendants were engaged in a "pattern of racketeering activity" to determine whether the district court erred in dismissing the claims of Riggs and Thomas for failure to state a pattern.

## C. Defining a Pattern of Activity Under RICO: Relationship and Continuity

The district court's assumption that two predicate acts constitute a pattern under 18 U.S.C. § 1961(5) in finding a pattern with regard to the claims of Brown, Fanaly, Way, and Orlikowski fails to heed the Supreme Court's definition of "pattern" set forth in *H.J. Inc.*, 492 U.S. at 238-43. In *H.J. Inc.*, the Supreme Court held that "while two [predicate] acts are necessary, they may not be sufficient." *Id.* at 237 (internal quotation marks omitted). Beyond setting forth the minimum number of predicate acts required to establish a pattern, § 1961(5) "assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *H.J. Inc.*, 492 U.S. at 238. "Congress intended to take a flexible approach" to satisfying whatever is required beyond the minimum number of predicate acts, "and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *Id.* Within the numerous sorts of relationships that can constitute a pattern, two elements must be shown: "that the racketeering predicates are *related*, *and* that they amount to or pose a threat of *continued* criminal activity." *Id.* at 239 (first and third emphases added).

A relationship among predicate acts is established when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (internal quotation marks omitted). The "use of the disjunctive suggests that the Court meant to craft a broad test of relatedness." *United States v. Blandford*, 33 F.3d 685, 703 (6th Cir. 1994).

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Continuity may be demonstrated in a number of ways. Closed-ended continuity can be shown "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Determining whether open-ended continuity has been

---

[3] The district court's treatment of Orlikowski's claim is confused. The district court noted that Orlikowski "fails to specify the means of the communication" with regard to one of the two predicate acts he alleges, *Brown*, 409 F. Supp. 2d at 806 (commenting on the allegation in paragraph fifty-seven), and thus does not satisfy the requirement under Federal Rule of Civil Procedure 9(b) that a plaintiff allege, at a minimum, "the time, place and contents of the misrepresentation(s)," *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984). However, the district court simply dismissed the claims of Thomas and Riggs for failure to plead a "'pattern of racketeering activity'" on the ground that each alleged only one predicate act of fraud directed at him. *Brown*, 409 F. Supp. 2d at 806. Given the district court's apparent conclusion that only one of Orlikowski's two alleged predicate acts was sufficiently pleaded, it is not clear why the district court dismissed solely the claims of Thomas and Riggs for failure to plead a pattern. Ultimately, the district court's view of Orlikowski's claims is immaterial because, as we later make clear, Orlikowski has sufficiently pleaded a RICO pattern on the basis of the alleged conduct of the defendants, regardless of the precise number of acts he alleges relate specifically to him.

established requires a court to probe "the specific facts of each case." *Id.* "A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.* Even when "the number of related predicates involved may be small and they may occur close together in time," if "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," this "suppl[ies] the requisite threat of continuity." *Id.* A "threat of continuity may [also] be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* Therefore, "the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 242-43. In addition, "[t]he continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243 (footnote omitted).

## D. The Plaintiffs Have Pleaded a Pattern

The plaintiffs have pleaded with sufficient particularity at least thirteen predicate acts, which are comprised of allegedly fraudulent communications by mail and wire, including communications among the defendants and communications from the defendants to the plaintiffs relating to each of the plaintiffs' injuries and claims for benefits under the WCDA. Therefore, plaintiffs have met the minimum two-predicate-acts requirement. *See* 18 U.S.C. § 1961(5); *H.J. Inc.*, 492 U.S. at 237. The question remains as to whether the plaintiffs have satisfied *H.J. Inc.*'s relationship-plus-continuity standard. We conclude that they have.

First, the predicate acts alleged by the plaintiffs are related. They have the same purpose: to reduce Cassens's payment obligations towards worker's compensation benefits by fraudulently denying worker's compensation benefits to which the employees are lawfully entitled. They have the same result: to deny worker's compensation benefits to certain Cassens's employees who are entitled to such benefits under Michigan law. They have the same participants: alleged in the complaint are worker's compensation officials at Cassens and Crawford, including Tina Litwiller, a claim adjuster for Crawford, and Margules, a doctor who the plaintiffs allege, with regard to some of the predicate acts, fraudulently recommended ineligibility of benefits at the request of Cassens and Crawford. They have the same victims: alleged in the complaint are certain Cassens employees who are eligible for worker's compensation benefits. They have similar methods of commission: fraudulent misapplication of the legal standards set forth in the WDCA in denying worker's compensation benefits to Cassens's employees by Titwiller, other officials working for defendants, or Margules.

Second, the predicate acts are continuous under either a closed- or open-ended theory. "[P]laintiff[s] may prove [closed] continuity by showing a series of past related predicates occurring over an extended period of time," generally more than "[a] few months." *Vild*, 956 F.2d at 569; *see also H.J. Inc.*, 492 U.S. at 242 (noting that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement"). The plaintiffs have alleged a series of related predicate acts that span well over three years. This constitutes a period of closed-ended continuity.

As for open-ended continuity, the Supreme Court has explained that an open period of continuity is stated when "the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 243. The plaintiffs allege precisely that. Specifically, the plaintiffs allege that the legitimate business or part of the legitimate business of each of the defendants—addressing its employees worker's compensation claims for Cassens, worker's compensation claim administration on behalf of Cassens for Crawford, and offering his medical opinion on worker's compensation claims for Margules—is regularly conducted by fraudulently

denying benefits to which the employees are entitled through the use of fraudulent communications by mail and wire. Although the plaintiffs do not specifically allege that this conduct is ongoing, given that "the threat of continuity need not be established solely by reference to the predicate acts alone," and that "facts external to the predicate acts may, and indeed should, be considered," *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (explaining that "the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing criminal activity"), the plaintiffs' allegations also state a period of open continuity.

Each of the plaintiffs has also sufficiently pleaded that they were injured by the defendants' "pattern of racketeering activity" under 18 U.S.C. § 1964(c) because the defendants' fraud deprived the plaintiffs of worker's compensation benefits and caused them to incur attorney fees and medical care expenses.[4]

## IV. RELIANCE AS AN ELEMENT OF FRAUD IN A CIVIL RICO CLAIM

### A. Reliance Is Not Required for a Civil RICO Fraud Claim

The Supreme Court recently held "that a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, — U.S. —, 128 S. Ct. 2131, 2145 (2008). Resolving a circuit split, the Court unanimously determined that "first-party reliance is [not] an element of a civil RICO claim predicated on mail fraud." *Id.* at 2137. The Court found that neither the statute nor common-law rules or policy arguments provided a basis for imposing a first-party reliance requirement. *Id.* at 2139. *See also Chaz Concrete Co. v. Codell*, — F.3d —, 2008 WL 4629907, at *2 (6th Cir. Oct. 21, 2008).

---

[4]Federal Rule of Civil Procedure 9(b)'s requirement that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" has been applied to allegations of fraud made in support of a RICO claim. *See, e.g.*, *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152-53 (6th Cir. 1987). Rule 9(b) has been construed to require a plaintiff to allege, at a minimum, "the time, place and contents of the misrepresentation(s)." *Bender*, 749 F.2d at 1216. On this basis, the district court dismissed the allegations set forth in paragraphs 12, 16A, 24, 32, 34, and 57 of the complaint for lack of the requisite particularity under Rule 9(b). The plaintiffs argue that this ruling was in error because, under Federal Rule of Civil Procedure 11(b)(3), these allegations "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," and because the defendants had exclusive possession of the particular details related to these allegations of fraud.

The plaintiffs contend that under Rule 11(b)(3) and *Rotella v. Wood*, 528 U.S. 549, 560 (2000), the district court should have afforded them the opportunity for discovery to flesh out the details of these allegations before dismissing them. In *Rotella*, a civil RICO suit alleging fraud, the Supreme Court explained that Rule 11(b)(3) provides "flexibility, . . . allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella*, 528 U.S. at 560 (citing *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1050-51 (7th Cir. 1998)). In rejecting the plaintiffs' position, the district court stated that "while Rule 11(b)(3) may relax Rule 9(b)'s particularity requirement, it cannot be construed to eviscerate that requirement in its entirety by permitting rank speculation." *Brown*, 409 F. Supp. 2d at 805. In light of our holding that the plaintiffs have successfully pleaded a "pattern of racketeering activity" *without* considering the dismissed allegations and the liberal amendment standard under Federal Rule of Civil Procedure 15(a), *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005), we need not consider the correctness of the district court's ruling in dismissing these allegations for lack of particularity. We express no view as to whether the district court should have permitted the plaintiffs to plead additional particular facts after discovery under Rule 11(b)(3), other than to note that such a notion is not foreign to this court. *See Michaels Building Co. v. Ameritrust Co.*, 848 F.2d 674, 679-81 (6th Cir. 1988) (holding that plaintiffs alleging RICO civil fraud claims that failed to satisfy Rule 9(b)'s particularity requirement were entitled to opportunity for discovery under Rule 11(b)(3) before their claims were dismissed). Should discovery confirm the plaintiffs' initial beliefs regarding the fraudulent nature of the dismissed allegations and provide the necessary details to satisfy Rule 9(b), the plaintiffs can then amend the complaint to replead the dismissed allegations. *See* FED. R. CIV. P. 15(a); *Tucker*, 407 F.3d at 788.

In addition to rejecting a reliance requirement, the Court in *Bridge* also reaffirmed its position in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992), that 18 U.S.C. § 1964(c) "requires the plaintiff to establish proximate cause in order to show injury 'by reason of' a RICO violation." *Bridge*, 128 S. Ct. at 2141. The Court reiterated that this "'demand[s] . . . some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 2142 (quoting *Holmes*, 503 U.S. at 268). Nonetheless, although first-party reliance might be useful in showing proximate causation, "'the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action.'" *Id.* at 2144 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 478 (2006) (Thomas, J., concurring in part and dissenting in part)).

After *Bridge*, plaintiffs need not plead or prove that they relied on defendants' alleged misrepresentations in order to establish the elements of their civil RICO claim based on mail or wire fraud. Dismissal of plaintiffs claims on this basis cannot be sustained.

## B.  Plaintiffs Have Sufficiently Pleaded that Their Injuries Were "By Reason of" the Defendants' Alleged Fraud

Plaintiffs have sufficiently pleaded that the defendants' fraud was directly related to and was the proximate cause of their injuries as required by 18 U.S.C. § 1964(c) under *Holmes*, 503 U.S. at 268, and *Anza*, 547 U.S. at 456-61. Accepting the facts as recited in the complaint, the defendants' fraudulent acts were a "substantial and foreseeable cause" of the injuries alleged by the plaintiffs: the deprivation of their worker's compensation benefits and expenses for attorney fees and medical care. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (explaining, in a RICO case, that proximate cause is shown when "the wrongful conduct [is] a substantial and foreseeable cause" of the injury and the relationship between the wrongful conduct and the injury is "logical and not speculative"). The "direct causal connection" requirement has been met, as no "intricate, uncertain" inquiries are required to link the defendants' alleged fraud and the plaintiffs' injuries. *Anza*, 547 U.S. at 460.

## V.  REVERSE PREEMPTION UNDER THE McCARRAN-FERGUSON ACT

The McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance." "The McCarran-Ferguson Act thus precludes application of a federal statute in face of state law 'enacted . . . for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." *Humana, Inc. v. Forsyth*, 525 U.S. 299, 307 (1999) (alteration in original) (quoting 15 U.S.C. § 1012(b)). The district court concluded that the WDCA reverse preempts RICO under the McCarran-Ferguson Act because RICO does not "relate to the business of insurance," the WDCA was enacted to regulate the business of insurance, and RICO would impair the WDCA. *Brown*, 409 F. Supp. 2d at 808-11. The plaintiffs appeal this conclusion, arguing that WDCA was not enacted to regulate the business of insurance and that RICO will not "invalidate, impair, or supersede" the WDCA.[5]

## A.  The WDCA Was Not Enacted for the Purpose of Regulating the Business of Insurance

The Supreme Court has explained that "'[s]tatutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly, are laws regulating the business of insurance,' within the meaning of the phrase [used by McCarran-Ferguson]." *United States Dep't*

---

[5]The parties agree that RICO does not "specifically relate[] to the business of insurance." 15 U.S.C. § 1012(b).

*of Treasury v. Fabe*, 508 U.S. 491, 501 (1993) (alteration in original) (quoting *SEC v. Nat'l Secs., Inc.*, 393 U.S. 453, 460 (1969)).  The Supreme Court has also emphasized that

> the focus of McCarran-Ferguson is upon the relationship between the insurance company and its policyholders:  "The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class.  But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder."

*Id.* (quoting *Nat'l Secs.*, 393 U.S. at 460).

In determining whether particular practices constitute "'the *business of* insurance'" under the McCarran-Ferguson Act, three factors are considered: "'*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.'"  *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 339 (2003) (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982)).[6]  No one factor is determinative.  *Pireno*, 458 U.S. at 129.

In assessing whether a state law addresses "the business of insurance" under the McCarran-Ferguson Act, the Supreme Court has made clear that the focus is on "how to characterize *conduct* undertaken by private actors," rather than "how to characterize *state laws* in regard to what they 'regulate.'"  *Ky. Ass'n of Health Plans, Inc.*, 538 U.S. at 337; *id.* at 340.  There are two possible views as to the forms of conduct or practices that the WDCA encompasses that can be considered in assessing whether the WDCA covers "the business of insurance."   First, the worker's compensation benefits mandated by the WDCA can be seen as a form of insurance to provide compensation for workplace injuries, thus perhaps creating an insurance-like relationship in which the employer is the "insurer" and the employee is the "insured."  This will be referred to as the "benefits-as-insurance" theory.  Alternatively, the WCDA contains provisions regulating how an employer can insure itself to provide worker's compensation coverage that could be seen as part of "the business of insurance."  This will be referred to as the "insurance-provisions" theory.

In arriving at the conclusion that the WDCA addresses "the business of insurance," the district court appeared to rely on the benefits-as-insurance theory.  This understanding of the WDCA is precarious at best.  As stated above, "[t]he focus of McCarran-Ferguson is upon the relationship between the *insurance company* and *its policyholders*."  *Fabe*, 508 U.S. at 501 (emphasis added).  Under the benefits-as-insurance theory, there is no relationship between an insurance company and a policyholder because worker's compensation benefits are not insurance.  Although at first blush worker's compensation benefits may seem to act as a form of insurance because they provide compensation for injuries like many forms of insurance, closer scrutiny reveals that this insurance-like impression is solely a matter of appearance.

---

[6]The plaintiffs err by asserting that "'a state law regulates insurance if a common sense meaning of the language of the statute indicates that it is specifically directed toward [the insurance] industry,'" Appellants Br. at 50 (quoting *Med. Mut. of Ohio v. DeSoto*, 245 F.3d 561, 573 (6th Cir. 2001)), and then relying on this standard to argue that WDCA was not "enacted . . . for the purpose of regulating the business of insurance."  This standard relates to the ERISA savings clause rather than to McCarran-Ferguson reverse preemption, and, as the Supreme Court has held, these standards are distinct.  *See Ky. Ass'n of Health Plans, Inc.*, 538 U.S. at 339-42.

Insurance is defined as "[a] contract by which one party (the insurer) undertakes to indemnify another party (the insured) against risk of loss, damage, or liability arising from the occurrence of some specified contingency." BLACK'S LAW DICTIONARY (8th ed. 2004). There is no contract in the worker's compensation scheme. The district court attempts to dismiss the importance of the lack of a contract under the benefits-as-insurance theory by stating that "[t]he WDCA simply deprives the parties of their freedom of contract and, instead, imposes the benefits and burdens of the predetermined bargain upon them." *Brown*, 409 F. Supp. 2d at 810. However, not only does this view fundamentally misconceive the nature of the worker's compensation scheme, it ignores the text of the McCarran-Ferguson Act, which only applies to state statutes that regulate "the *business of* insurance," 15 U.S.C. § 1012(b) (emphasis added), not those governing employers' obligations to their employees for workplace injuries.

The WDCA is a public regulation of the employment relationship that is a substitute for the tort system rather than any contractual relationship between employees and employers. *See generally* Richard A. Epstein, *The Historical Origins and Economic Structure of Workers' Compensation Law*, 16 GA. L. REV. 775 (1982). In the context of true contractual accident-insurance relationships, the insurer owes no preexisting duty to the insured to compensate the insured for any injury that the insured may sustain. Rather, as with other contractual relationships, the insured provides consideration in exchange for the insurer's obligation to pay benefits upon the event of an accident. By contrast, in the worker's compensation context, the employer owed the employee a preexisting duty under common-law tort to compensate the employee for workplace injuries due to the fault of the employer. Mandatory worker's compensation schemes, including the WDCA, remove the employee's obligation to prove negligence and causation in exchange for certain benefits in the event of a workplace injury and relinquishing the right to sue (except in cases of intentional torts). However, the employer is not akin to an insurer because it had a preexisting duty under common law to compensate for workplace injuries, and worker's compensation merely creates a legislative remedy regarding the tort-liability relationship between employees and their employers, not an insurance contract. There is therefore no insurer and no insured.

Moreover, under the benefits-as-insurance view, the WDCA does not satisfy the *Pireno* factors. 458 U.S. at 129. The WDCA does not spread the policyholder's risk because, as just explained, there is no contractual insurance relationship and thus no policyholder in the WDCA benefits-as-insurance approach. Further, the WDCA certainly is not limited to entities within the insurance industry because the WDCA applies to all Michigan employers and employees except those who are specifically exempted. MICH. COMP. LAWS § 418.111. Therefore, under the benefits-as-insurance view, WDCA cannot be seen as addressing "the business of insurance" because the WDCA is a mandatory, public regulation of the tort-liability relationship between employers and employees rather than a regulation of the contractual insurance relationship that underlies "the business of insurance."

Most important, we emphasize that whether the WDCA addresses any practices related to "the business of insurance" is not the same inquiry as whether the WDCA was "*enacted . . . for the purpose of regulating* the business of insurance." "To equate laws 'enacted . . . for the purpose of regulating the business of insurance' with the 'business of insurance' itself . . . would be to read words out of the statute," which the Supreme Court, and we, "refuse to do." *Fabe*, 508 U.S. at 504; *see also Ky. Ass'n of Health Plans*, 538 U.S. at 340 (emphasizing that the McCarran-Ferguson Act is concerned with the purpose of the enactment of the state law); *Genord v. Blue Cross & Blue Shield of Michigan*, 440 F.3d 802, 806 (6th Cir. 2006). Therefore, the purpose for enacting the state statute must be considered in assessing this element of McCarran-Ferguson reverse preemption. The district court erred in failing to do so.

The purpose of enacting the WDCA "was to require an employer to compensate a worker for any injury suffered in the course of the worker's employment, regardless of who was at fault."

Edward Welch, *Worker's Compensation in Michigan:  Law and Practice* § 1.2 (4th ed. 2001); *accord Simkins v. Gen. Motors Corp.*, 556 N.W.2d 839, 843-44 (Mich. 1996).  In exchange for certainty and ease of recovery for the employee, the employer's liability was limited and defined by making worker's compensation the exclusive remedy except in cases of intentional torts.  Welch, at § 1.2; *Simkins*, 556 N.W.2d at 843-44.  The Michigan Supreme Court has stated that "[t]he purpose of the [WDCA] as set forth in its title, is to promote the welfare of the people of Michigan relating to the liability of employers for injuries or death sustained by their employees." *Whetro v. Awkerman*, 174 N.W.2d 783, 785 (Mich. 1970).  The WDCA's focus on providing certain recovery to employees for workplace injuries while limiting employers' liability rather than the regulation of insurance is underscored by a number of factors.  The WDCA was placed in chapter 418 of the Michigan Compiled Laws, which addresses labor matters, rather than in chapter 500, which contains the Michigan Insurance Code.  Additionally, the Worker's Compensation Agency rather than the Office of Financial and Insurance Services administers the WDCA.  This indicates that the provisions relating to insurance policies within the WDCA were included merely to effectuate the WDCA's primary goal of employee compensation.

Our conclusion that worker's compensation benefits are not insurance and our conclusion that the WDCA was not "*enacted . . . for the purpose of regulating* the business of insurance," each independently foreclose the defendants' argument that the WDCA reverse preempts RICO under the McCarran-Ferguson Act.  We additionally note that even in the absence of these conclusions that preclude reverse preemption, the defendants' insurance-provisions theory would not support their reverse-preemption argument.  The insurance-provisions theory views the WDCA as regulating "the business of insurance" because there are a number of provisions in the WDCA regarding the insurance an employer may buy to secure payment for worker's compensation benefits.  Under the insurance-provisions theory, therefore, the employer is the insured and the company providing the insurance is the insurer.  There are several provisions of the WDCA that directly relate to the terms of the insurance contract and thus to "the business of insurance." *See Fabe*, 508 U.S. at 502-03 (indicating that a statute that "prescrib[es] the terms of the insurance contract" is one that "regulates the 'business of insurance'").  Michigan Compiled Laws § 418.621(2) states that every insurance contract providing worker's compensation-benefits coverage to employers must "insure, cover, and protect in the same insurance policy, all the business, employees, enterprises, and activities of the employer."  Section 418.621(4) states that "[e]xcept as modified by the director as provided for herein, each policy of insurance covering worker's compensation in this state shall contain the following provisions," and then lists the specific provisions of the insurance policy, which address "Compensation," "Medical services," "Rehabilitation services," "Funeral expenses," "Scope of contract," "Obligations assumed," "Termination notice," and "Conflicting provisions."  Section 418.631(1), which sets forth the consequences for an insurer who fails to pay claims for compensation, also relates to "the business of insurance" because it addresses the performance of the insurance contract.  *See Fabe*, 508 U.S. at 503 ("There can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance.'"); *id.* at 504 (explaining how the performance of an insurance contract satisfies the *Pireno* test).  One point is crucial here: Cassens self insures.  Therefore, the practices at issue in this case do not relate to those provisions of the WDCA that address the "business of insurance."  Moreover, self-insurance does not relate to the "business of insurance" under the McCarran-Ferguson Act because there is no relationship between an insurer and an insured.  *See Fabe*, 508 U.S. at 501.

Because worker's compensation benefits are not a form of insurance and the insurance-policy provisions are a minor element of the WDCA that was not part of the purpose for enacting the law, the WDCA was *not* "enacted . . . for the purpose of regulating the business of insurance," and thus it does not reverse preempt the plaintiffs' RICO claims.

## B.  RICO Would Not Invalidate, Impair, or Supersede the WDCA

Although our conclusion that the WDCA was not "enacted . . . for the purpose of regulating the business of insurance," disposes of the defendants' reverse-preemption argument, we note that RICO is also saved from reverse preemption by the WDCA under the McCarran-Ferguson Act because RICO would not "invalidate, impair, or supersede" the WDCA.  RICO would not invalidate or supersede the WDCA because RICO would not "render [the WDCA] ineffective" given that those subject to these laws can comply with both simultaneously.  *See Humana*, 525 U.S. at 307 ("The term 'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law[,]' [a]nd the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'").  The question remains whether RICO would "impair" the WDCA.  In construing the term "impair," the Supreme Court explained that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application."  *Id.* at 310.

The WDCA bars and imposes sanctions on the denial of benefits to which employees are legally entitled.  MICH. COMP. LAWS §§ 418.631, 418.801.  A RICO claim here would also act to punish the improper denial of benefits if done as part of a pattern of racketeering activity.  "To the extent that the [state] law prohibited practices also prohibited under federal law," the federal law does not "frustrate a goal of [the state] law."  *Humana*, 525 U.S. at 310-11 (internal quotation marks omitted).  Moreover, the federal interest in protecting individuals against a pattern of racketeering activity based on fraud is "'perfectly compatible'" with the state interest in providing a certain remedy for employees who have suffered workplace injuries.  *Id.* at 311.  The only aspect of RICO that would arguably impair the WDCA is the difference in the remedies provided for under RICO and the WDCA.  RICO allows for treble damages and attorney fees, 18 U.S.C. § 1964(c), whereas the WDCA provides that

> [i]f weekly compensation benefits or accrued weekly benefits are not paid within 30 days after becoming due and payable, in cases where there is not an ongoing dispute, $50.00 per day shall be added and paid to the worker for each day over 30 days in which the benefits are not paid.  Not more than $1,500.00 in total may be added pursuant to this subsection.

MICH. COMP. LAWS § 418.801(2).  In *Humana*, the Supreme Court considered whether "a federal law, which proscribes the same conduct as state law, but provides materially different remedies, 'impair[s]' state law under the McCarran-Ferguson Act?"  525 U.S. at 305.  The Court answered this question in the negative.  *Id.* at 311.

The Court's conclusion in *Humana* applies equally here.  First, *Humana* treats the impairment consideration as an "as-applied" challenge that looks to whether the federal statute would impair the state statute in a particular application.  In *Humana*, the availability of punitive damages under state law greater than the treble damages available under RICO supported the conclusion that RICO did not impair the state law.  525 U.S. at 312.  The Court held this even though the state law would not allow for the imposition of punitive damages "when doing so would threaten the solvency of the defendant" because "the record contains no evidence of insolvency here."  *Id.* at 313 n.12.  Here, because Cassens self-insures, there is no risk of any impairment of the state policy relating to the regulation of insurance.  Therefore, a RICO suit in this case would not impair the WDCA's regulation of "the business of insurance."

Second, unlike the state law at issue in *Humana*, which was also directed at insurance fraud, the WDCA provision regarding sanctions for failure to pay benefits does not appear to contemplate the *fraudulent* denial of worker's compensation benefits.  Therefore, a RICO suit would not

contravene any "*declared* state policy or interfere with [the state's] administrative regime," which does not address the fraudulent denials of benefits. *Humana*, 525 U.S. at 310 (emphasis added). The district court's assertion that a RICO suit would impair the WDCA's policy of limited liability for employers relies on the faulty premise that the state has a policy of limited liability for employers even when they *fraudulently* deny worker's compensation benefits. No authority supports this position. As in *Humana*, the fact that the state "filed no brief at any stage of this lawsuit urging that application of RICO to the alleged conduct would frustrate any state policy, or interfere with the State's administrative regime" further supports the conclusion that there is no impairment here. *Id.* at 314. We therefore hold that the WDCA does not reverse preempt RICO because the WDCA was not "enacted . . . for the purpose of regulating the business of insurance" and because RICO would not "invalidate, impair, or supersede" the WDCA.

## VI. INTENTIONAL INFLICTION OF EMOTION DISTRESS

After dismissing the plaintiffs' RICO claims, the district court proceeded to address their state-law IIED claims, even though a federal court should typically decline to exercise pendent jurisdiction over a plaintiff's state-law claims after dismissing the plaintiff's federal claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The district court addressed these claims because it mistakenly believed that "the resolution of Plaintiffs' IIED claims is necessary to the Court's determination of whether the WDCA reverse-preempts Plaintiffs' RICO claims under the McCarran-Ferguson Act." *Brown*, F. Supp. 2d at 813. As is clear from our analysis above, the resolution of plaintiffs' IIED claims has no bearing on the reverse-preemption issue, which turns on the purpose of the WDCA and on RICO's effect on the WDCA. Because in this case the "'interests of judicial economy and the avoidance of multiplicity of litigation'" did not trump the interest in "'needlessly deciding state law issues,'" the district court abused its discretion in exercising pendent jurisdiction to decide the plaintiffs' state-law claims. *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993)). Despite the district court's error in addressing the plaintiffs' IIED claims, because we are reversing the dismissal of plaintiffs' federal RICO claims, we will proceed to review the district court's decision dismissing the IIED claims.

In construing questions of state law, a federal court must apply state law in accordance with the controlling decisions of the highest court of the state. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999). "The Michigan Supreme Court has never formally recognized IIED as a cause of action." *Moon*, 465 F.3d at 728 (citing *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 913 (Mich. 1985)); *see also Smith v. Calvary Christian Church*, 614 N.W.2d 590, 595 (Mich. 2000) (Weaver, C.J., concurring). Assuming such a claim does exist, a plaintiff must show the following elements to establish an IIED claim: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Roberts*, 374 N.W.2d at 908 (internal quotation marks omitted). The Michigan Supreme Court has described "extreme and outrageous conduct" as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* at 908-09 (internal quotation marks omitted).

In applying this standard, the Michigan Supreme Court held that a no-fault insurer's "failure . . . to facilitate the filing of a replacement services claim, a delay of at most six months in responding to the claim as filed, and the denial of benefits owed" was insufficient to meet the standard for outrageous conduct. *Id.* at 911. In arriving at this conclusion, the court noted that "[t]here is no indication that [the insurer] set out to harass these plaintiffs, nor does the evidence disclose a course of conduct that may fairly be characterized as so outrageous in character . . . as to go beyond all possible bounds of decency . . . ." *Id.* (internal quotation marks omitted).

We affirm the district court's dismissal of the plaintiffs' IIED claims because, like the defendant's conduct in *Roberts*, the plaintiffs' allegations of defendants' fraudulent denial of worker's compensation benefits are not "so outrageous in character . . . as to go beyond all possible bounds of decency." *Id.* Decisions of the Michigan Court of Appeals confirm this conclusion. That court has explained that the "wrongful, bad faith termination of benefits, by itself, is not sufficiently outrageous to support a claim for intentional infliction of emotional distress." *Atkinson v. Farley*, 431 N.W.2d 95, 97 (Mich. Ct. App. 1988). Even the wrongful denial of worker's compensation benefits "to further some ulterior motive of the defendants," as the plaintiffs here allege, is insufficiently outrageous to support an IIED claim under Michigan law. *Lisecki v. Taco Bell Rests., Inc.*, 389 N.W.2d 173, 175 (Mich. Ct. App. 1986); *accord Hajciar v. Crawford & Co.*, 369 N.W.2d 860, 864 (Mich. Ct. App. 1985).[7] For these reasons, dismissal of the plaintiffs' IIED claims was proper.

## VII. CONCLUSION

We **REVERSE** the dismissal of plaintiffs' RICO claims because their RICO claims are not preempted by state law and because plaintiffs have adequately pleaded a pattern of racketeering activity despite the lack of reliance on the defendants' fraudulent acts and **REMAND** to the district court for further proceedings consistent with this opinion. We **AFFIRM** the dismissal of the IIED claims because the defendants' alleged conduct cannot meet Michigan's standard for outrageous conduct.

---

[7]In the district court, Cassens argued that § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141, preempted plaintiffs' IIED claims. The district court did not address this argument because it dismissed the IIED claims under Rule 12(b)(6). The district court likely should have addressed the preemption question first because in cases of LMRA preemption, the court must "recharacterize" the state cause of action as a federal claim and analyze the claim under federal law. 14B Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3722.1 (3d ed. 1998). However, the defendants do not raise LMRA preemption on appeal, and thus we simply review the district court's decision to dismiss for failure to state a claim.